**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. REGINA FAUBEL,** | ) | **CIVIL ACTION NO.**   2:23-cv-2088 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNIVERSITY OF PITTSBURGH,** | ) | |
| | ) | |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.     PRELIMINARY STATEMENT

By this action, Plaintiff, Dr. Regina Faubel, seeks wage loss, compensatory and punitive damages, costs, attorneys' fees, pre and post-judgment interest because The University of Pittsburgh discriminated against her in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112, the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"), Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504") and Family Medical Leave Act U.S.C. § 2615.   Dr. Faubel brought this complaint because the University of Pittsburgh failed to implement reasonable accommodations, failed to engage in the interactive process, failed to correct an extremely hostile work environment, and retaliated against Dr. Faubel for engaging in protected activity.

### II.     JURISDICTION

1.     This Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

3.      On November 11, 2022, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") against Defendant, alleging disability discrimination and retaliation.  Plaintiff's Charge was dual-filed with the Pennsylvania Human Rights Commission (hereinafter "PHRC").

4.      The EEOC issued a Notice of Right to Sue Letter to Plaintiff on September 8, 2023. This Complaint has been filed within ninety (90) days of the Plaintiff's receipt of the letter, thus making this action timely.

5.      It has been one year since Plaintiff filed a charge with the PHRC and her PHRA claims are timely.

### III.    PARTIES

6.      Plaintiff is Dr. Regina Faubel (hereinafter "Dr. Faubel"), an adult individual who resides in Butler Co.

7.      Defendant The University of Pittsburgh (hereinafter "University") is located at 2400 Cathedral of Learning 4200 Fifth Ave., Pittsburgh, PA 15260.

8.      Defendant employs more than 500 employees.

9.      At all relevant times, the University is an employer within the definition of the ADA and the PHRA.

10.     At all relevant times, Dr. Faubel was an employee of the University within the definition of the ADA and PHRA.

11.    In August 2016, Dr. Faubel accepted a position with the University of Pittsburgh as a postdoctoral research fellow. Based on continued funding, Dr. Faubel received a contract renewal after one year. After two years, Dr. Faubel accepted a position as a visiting scholar that was to a great part funded by the German Research Foundation. In parallel to her full-time research position, Dr. Faubel also accepted a part-time teaching position at the University of Pittsburgh in Fall 2018. In Fall 2020, Dr. Faubel received a contract renewal based on continued funding. In March 2021, Dr. Faubel was offered a full-time faculty position as a Research Instructor based on continued funding. In the Summer of 2022, the contract was renewed based on continued funding.

12.    Dr. Faubel is qualified for her former position as a Research Instructor.

13.    Dr. Faubel earned her doctorate from the University of Goettingen and performed her thesis work at the highly renowned Max Planck Society. With this research, Dr. Faubel founded a new field of research which she is internationally recognized for.

14.    Between 2016 and 2022, Dr. Faubel implemented this research field at the University of Pittsburgh and made ground-breaking discoveries of novel epilepsy mechanisms. Her work was recognized by the German Research foundation (DFG) and the LouLou Foundation by funding of Dr. Faubel's work at the University of Pittsburgh for continuing her employment.

15.    Between 2016 and 2022, Dr. Faubel received independent research funding, two international prizes for her outstanding research, and she was invited to speak at numerous international conferences.

16.    Dr. Faubel was awarded renewable contracts until she asked for accommodations for her disability and engaged in protected activity. After requesting accommodations for her

disabilities and engaging in protected activity, Dr. Faubel's contract was changed so that her position would not renew after December 2022.

17.     Dr. Faubel is able and available to work with or without reasonable accommodations and can travel for work. Dr. Faubel had no problem working with her students and collaborators throughout 2019 and 2022 as they refrained from wearing Triggering Chemicals.

18.     The University of Pittsburgh did not renew Dr. Faubel's contract after December 2022.

## VI.     STATEMENT OF CLAIM

**A. Dr. Faubel's Disability**

19.     In or around Fall 2019, Dr. Faubel developed new onset reactive asthma ("Disability").

20.     Dr. Faubel's reactive asthma is triggered by certain chemicals commonly found in various scented items ("Triggering Chemicals"). Dr. Faubel developed an allergy to the Triggering Chemicals the more she was exposed to them.

21.     Dr. Faubel's reactive asthma has changed over time: in the absence of triggering Chemicals, Dr. Faubel has no symptoms. In line with this, her reactive asthma fully recovered in Spring 2021 when she traveled to Europe. In contrast, repeat exposures to unreasonably high doses in the workplace in Fall 2021 subjected Dr. Faubel to significantly more severe symptoms than she experienced in 2019. These massive exposures in 2021 also caused the development of various systemic allergic symptoms in addition to the worsening of asthma attacks. Due to the refusal of the University to address exposure and harassment, the disability was gradually exacerbated and aggravated.

22.     Dr. Faubel's health condition causes her to have the following symptoms: extreme difficulty breathing, anaphylaxis, swelling, headaches, neuropathy, airway, muscle, joint and airway pain, eye problems, diarrhea, tinnitus, malaise, dizziness, and loss of consciousness. If

the reaction to triggering chemicals is severe enough, Dr. Faubel could die of anaphylaxis or of secondary injuries from the immunological response, and she could also die of any occurrence of an asthma attack as a non-accommodated worker recently did in Colorado.

23.     Dr. Faubel's disability interferes with her major life activities of breathing, thinking, concentrating, and working.

24.     Not all scented items cause Dr. Faubel to have reactive asthma as they may not have the Triggering Chemicals or contain only low amounts. Certain hand sanitizers and lotions without fragrance do not contain the Triggering Chemicals and can be used safely around Dr. Faubel.

**B. Dr. Faubel Reported Her Disability to the University of Pittsburgh**

25.     In or around Fall 2019, Dr. Faubel experienced a reactive asthma attack at the University of Pittsburgh triggered by colleagues eating oranges in the lab area. The presence of food in the lab violated  safety rules. At the time, Dr. Faubel confided in Dr. Tim Feinstein about her new reactive asthma and Dr. Feinstein asked the co-workers to refrain from bringing heavily scented items including oranges into the lab area.

26.     In or around Fall 2019, Dr. Faubel reported her disability directly to her supervisor, Dr. Cecilia Lo, who is the Chair of the Department of Developmental Biology.

27.     Thus, Dr. Lo was in the position to enforce existing rules and she was in the position to define new rules including a fragrance-free policy for Departmental Spaces. Dr. Lo was the logical person for Dr. Faubel to report her disability to.

28.     After Dr. Faubel reported her disability, Dr. Lo failed to direct Dr. Faubel to the University of Pittsburgh Office of Disability Resources and Services ("DRS").

29.     In 2019, Dr. Lo informed Dr. Faubel that she would ban strongly scented items from the shared lab spaces. However, this was not enforced by Dr. Lo.

30.    In or around 2019, Dr. Faubel also reported her disability to Senior Executive Administrator James Kaczynski. Mr. Kaszynski opposed the ban and also refused to intervene in violations of the OSHA-enforced biosafety rules and even prohibited the installation of posters merely informing about the occurrence of reactive asthma triggered by peeling oranges.

**C. Dr. Faubel Faced Intentional Disability Harassment and a Hostile Work Environment**

31.    From 2019 until 2022, Dr. Faubel faced numerous repeated exposures to Triggering Chemicals, some exposures on purpose and some accidentally.

32.    Each triggering exposure, both intentional and unintentional, caused Dr. Faubel's disability to worsen and cause more significant reactions.

33.    The intentional repeat exposures including spills caused Dr. Faubel's disability to worsen rapidly while isolated uninformed exposures were at most times not sufficient to trigger a reaction. Intentional exposures were usually drastically higher in concentration and occurred frequently without giving Dr. Faubel's immune system time for recovery. The intentional exposures also happened unpredictably, for example by sudden release of large amounts when Dr. Faubel was not paying attention while in the middle of an experiment or discussion.

To demonstrate high amounts of Triggers in the air, Dr. Faubel bought a detector to measure the concentration of particulate matter (PM2.5) and volatile organic compounds (VOCs) in the air. This confirmed that the amounts of chemicals were at times dangerously high when Dr. Faubel perceived them as strong. Dr. Faubel also bought a stationary VOC monitor at her workplace in the lab. It showed that over many days, VOC concentration in the air remained at baseline when Dr. Faubel didn't indicate that she would be in the lab. On the day that coworkers knew she would be at work, however, the VOC concentration would increase suddenly and drastically, even on days when coworkers expected her to come in but she was too sickened from exposure

to leave the house. In many instances, large areas of the lab were flooded with fragrance and non-disabled coworkers also started experiencing health symptoms. This coincided with either the presence of specific coworkers evaporating it from their skin and from products they carried with them, or from large spills of fragranced body care products.

34.    Dr. Faubel was hospitalized several times between 2019 and December 2022 for repeated exposure to Triggering Chemicals while at work.

35.    Throughout 2019 to 2022,  Dr. Maliha Zahid, Dr. Jiuann-huey Lin, Kayla McCandless, and Daniella Sahagun repeatedly harassed Dr. Faubel by bringing in items to the shared workspace they knew had Triggering Chemicals and placing them in areas where Dr. Faubel worked.

36.    In or around 2019 through the summer of 2021, Dr. Feinstein, though he was not a supervisor, placed significant peer pressure on Dr. Zahid and Dr. Lin to refrain from bringing strongly scented items into work. However, in the summer of 2021, Dr. Feinstein left the University of Pittsburgh. After Dr. Feinstein left, Dr. Zahid and Dr. Lin's harassment escalated significantly.

37.    In or around 2019, Dr. Feinstein, Dr. Faubel, and Dr. Lo  asked Dr. Zahid to stop bringing in scent-containing items into the workspace.

38.    When asked to stop bringing in items that contained scents and therefore Triggering Chemicals, Dr. Zahid informed Dr. Feinstein that Dr. Faubel's condition was merely psychological despite the life-threatening nature of Dr. Faubel's disability and never having treated Dr. Faubel or reviewed her medical records. Dr. Zahid continued to maintain a discriminatory view of Dr. Faubel's disability.

39.    Dr. Zahid expressed her opinions about Dr. Faubel's disability in official emails.

40.     Throughout 2019 - 2022, Dr. Faubel reported Dr. Zahid's harassment to her supervisors and later to the Office of Diversity, Equity, and Inclusion. In response to the reports of harassment, Dr. Zahid blamed Dr. Faubel for continuing symptoms, and eventually accused Dr. Faubel falsely of "harassment," of showing "bad behavior" and creating an "atmosphere of extreme unprofessionalism" by challenging their harassing actions.

41.     Throughout 2019 and continuing into 2022, Dr. Zahid went out of her way to expose Dr. Faubel to items that contained Triggering Chemicals including, but not limited to, fragrance-containing hand sanitizer, certain fragrance-containing lotions, oranges, potpourri scented room decorations,  scented candles, soaps, room scents, room sprays, and new perfume. Dr. Zahid did not previously bring in potpourri-scented room decorations or fragrance-containing lotions until she was asked not to eat oranges.

42.     Throughout 2019 - 2022, Dr. Faubel was injured and hospitalized multiple times for her disability due to the harassment of Dr. Zahid, Dr. Lin, Ms. McCandless, and Ms. Sahagun.

43.      Further, Dr. Faubel did not complain just about Dr. Zahid, but also about Dr. Lin, Ms. Sahagun, Ms. McCandless, that fragrance-free signs were being ripped down, that her office and her lab areas were being polluted with scented allergen when she arrived at work, and about students who were not properly informed or even refused to adhere to the fragrance-free policy.

44.     Dr. Zahid and  other co-workers decided to intentionally target Dr. Faubel because of her disability.

**D. Dr. Faubel Suffers Anaphylaxis Due to Systematic Harassment By Co-Workers**

45.     In or around Fall of 2021, Dr. Zahid restarted working in the lab near Dr. Faubel more frequently.

46.     In or around October 2021, Dr. Faubel started reporting to Dr Lo that she suddenly perceived large clouds of very strong, new fragrance that lingered, and she was unable to locate the source. While even strong fragrances usually dissipated when the person emitting it was out of sight, this was suddenly no longer the case.

47.     In or around October 2021,  Dr. Faubel reported to Dr. Lo worsening reactive asthma symptoms due to repeated exposure including fainting to the lab floor. Dr. Faubel reported to Dr. Lo that it affected her ability to prepare for a presentation. Dr. Faubel reported the health issues from fragrance in two lab meetings: she reported it started again forcing her to flee the lab and abandon her experiment to stay home for one or two days for recovery of Dr. Faubel's airway and new health symptoms that also affected her ability to focus.

48.      In or around November 8, 2021, Dr. Faubel asked Pitt EH&S to investigate the possibility that Triggering Chemicals were entering Dr. Faubel's work space from an air duct. However, EH&S excluded the Triggering Chemicals coming from the air duct and asked Dr. Faubel to sniff out the source. Dr. Faubel found that the Triggering Chemicals were coming from a shelf separating the desks of Ms. McCandles and Sahagun from Dr. Faubel's area.

49.     On November 9, 2021, the lab was fragrance free in the morning when Dr. Faubel arrived and someone from building maintenance checked and assured the fragrance must be introduced by coworkers. Only after Ms Sahagun and Ms McCandless arrived, strong fragrance started to flood the lab and force Dr. Faubel to again abandon her experiments. Dr. Faubel confronted them with the fact that the fragrance was only associated with their presence in the lab. Dr. Faubel had to talk to them from a large distance as the concentration was dangerously high near them, interfering with Dr. Faubel's ability to breathe and speak. Ms. Sahagun and Ms. McCandless sniffed the wooden shelf, their hands and inspected Ms McCandless' handbag and

denied to perceive anything or have any possible source with them. During the course of the discussion, Sahagun approached Dr. Faubel and pushed McCandeless' handbag towards her face - which carried a large bottle of lotion with a very strong scent emanating into and injuring Dr. Faubel's airway.

50.     On or about November 10, 2021, Dr. Zahid, Ms. Sahagun, and Ms. McCandless filed a complaint against Dr. Faubel. Dr. Lo called Dr. Faubel to tell her that HR and administration "got mad" and Dr. Faubel was supposed to move her workplace into either the shared necropsy/microscopy room or better even into the 4 spm chemical storage room with no window and heavy fire door.

51.     On or about November 11, 2021, Dr. Faubel planned to check the well being of her animals in the colony. She had to cross a locker room and while breathing, realized that the air of the locker room was fully saturated with either a chemical or an aerosol, which penetrated through Dr. Faubel's mask. She found the door on the other side blocked at first but managed to get out and run away to the colony room that she believed to be safe. Dr. Faubel then collapsed with an asthma attack and anaphylaxis. .

**E. Dr. Faubel Again Pleas for Accommodations Nearly Two Years After Accommodations Were Supposed to be Implemented.**

52.     In November 2021, after the extreme disability harassment significantly aggravated Dr. Faubel's health condition, she was asked to meet with Dr. Losee, the Dean of faculty at the Medical School of the University.

53.     During the November 2021 meeting, Dr. Losee yelled at Dr. Faubel for reporting the November 11, 2021 incident to the police and asking for protection from crime.

54.     On or about November 23, 2021, after Dr. Faubel reported the life-threatening attack, Leigh Culley from the Disability Reasources and Services reached out to Dr. Faubel regarding a

workplace accommodations. Ms. Culley requested various medical documentation from Dr. Faubel.

55.    On or about November 28, 2021, Dr. Faubel provided the requested medical documentation.

56.    On or about November 30, 2021, Dr. Faubel created a PowerPoint presentation and presented it to the DRS.

57.    On or about December 1, 2021, Dr. Faubel continued to advocate for accommodations including working an alternating schedule with Dr. Zahid, Ms. Sahagun, Ms. McCandless, and Dr. Lin in order to avoid the harassment and extremely hostile work environment that resulted in a dire emergency. Continuing to face the harassment could have cost Dr. Faubel her life.

58.    Between December 1 and 7, 2021, Dr. Faubel and Dr. Lo had several conversations about the harassment and Dr. Faubel's accommodation request. Dr. Lo wanted Dr. Faubel to work at night to avoid Dr. Zahid. However, Dr. Faubel had family responsibilities, safety concerns and concerns relating to the nature of her experiments that prevented her from working at night and asked that she be granted lab time every other  day. Dr. Lo did not approve of any of the accommodations.

59.    On or about December 7, 2021, Dr. Lo informed Dr. Faubel that she could only get an accommodation if every co-worker agreed to the accommodation. Dr. Faubel knew that was impossible because Dr. Zahid and other coworkers had purposely harassed Dr. Faubel about her disability.

60.    On or about December 8, 2021, Dr. Faubel informed Dr. Lo that she was still experiencing disability discrimination and the urgent need for accommodations. Dr. Faubel outlined how she had booked a room to work in but that a colleague entered wearing very

strong perfume that triggered Dr. Faubel's reactive asthma and caused her to leave the room. Dr. Faubel experienced continuing symptoms from the exposure for several days.

61.     On or about December 10, 2021, the University of Pittsburgh granted the following accommodations to Dr. Faubel:

      a.   Fragrance-Free environment applicable to departmental spaces

      b.   Coordination with staff as it pertains to microscope room usage to avoid potential fragrances

      c.   Environmental Services to employ fragrance-free cleaning solutions in bathrooms and departmental common areas.

      d.   On or about December 13, 2021, Dr. Faubel also received use of room 8118 in combination with granted coordination of the office spaces.

62.     However, none of the above accommodations addressed the two years of harassment Dr. Faubel faced. None of the harassers faced any consequences for their behavior.

63.     Unsurprisingly, the accommodations granted by the University of Pittsburgh's Disability Resources and Services were not implemented or followed.

64.     The "accommodations" were not communicated to several of Dr. Faubel's co-workers.

**F. Dr. Faubel Is Denied Reasonable Accommodations Including Those Officially Granted**

65.     The accommodations *included a fragrance-free environment*. However, the accommodations were not implemented, implemented ineffectively, or not enforced.

66.     After the department was declared fragrance-free, other employees and guests in the department continued to use fragranced products. They were not informed about the ban of fragrance from departmental spaces nor did they receive training about best practices to be fragrance-free.

67.     In 2019, Mr. Kaszynski explained to Dr. Faubel that he and HR,  "can't tell people what to do." He refused to ask people to refrain from using scented products even when it was with the purpose of harassing Dr. Faubel.

68.     Dr. Lo asked Dr. Faubel to approve fragrance-free lotion and provided it for everyone to use in the department and restrooms but the University of Pittsburgh also provided fragranced lotion, and coworkers continued to bring their own fragranced lotion into the lab that they knew contained Triggering Chemicals. They released it in Dr. Faubel's proximity, prepared Dr. Faubel's work area with spills that evaporated over hours, and Dr. Lin applied it excessively onto her skin when she was in proximity to Dr. Faubel.

69.     Dr. Lo did not communicate or enforce the coordination schedule and it was presented as optional and voluntary.

70.     When Dr. Faubel had signed up for an existing calendar for scheduling the use of a microscope, Dr. Lin would frequently enter the necropsy/microscopy room wearing highly fragranced lotion and forcing Dr. Faubel to run away and wait until the room was aired out. Some days, the time Dr. Faubel spent in front of the room while in pain from the exposure was longer than the time she actually sat at the scopes to do her work. On some days, fragranced spills were placed in the room prior to Dr. Faubel's sign-up time making it impossible to enter and work at all. Dr. Faubel reported this repeatedly as it made research and student supervision almost impossible, caused severe physical pain and emotional distress, and continuously aggravated the disability.

71.     Dr. Faubel reported to the continued disability harassment with civil rights advocacy response manager Stevvaie Brown.

72.     Dr. Zahid and others pressured Dr. Lo to remove Dr. Faubel's newly assigned desk for the microscopy/necropsy room.

73.     Specific sign up calendars were not created. Even though granted as accommodation, coworkers were not instructed how to coordinate the usage of small rooms and office spaces.

74.     Dr. Faubel and the department would place signs around the lab regarding her accommodations but the signs were removed. Dr. Faubel asked the University of Pittsburgh to investigate the removal of her signs. The University of Pittsburgh did not conduct an investigation.

75.     The environmental services team only partially implemented the fragrance-free cleaning solutions. The common areas continued to be cleaned with products containing Triggering Chemicals and fragranced hand soap continued to be refilled in the bathrooms.

76.     Dr. Faubel reported the violations, failures to implement the accommodations and continued disability harassment by her co-workers repeatedly to her supervisor and other members of the administration. Dr. Faubel also continued to assist with finding ways to implement. In a conversation with Personnel and Fiscal Administrator Christopher Fedor for example, she asked if employees of the department could be informed about the fragrance-free policy in lab spaces, and or at least the need to coordinate with her if they wear fragrance. As this was denied, she asked if at least newcomers could be handed over a printout informing about the fragrance-free policy and instructions. Mr. Fedor responded, "we can't do that."

77.     Dr. Faubel informed Ms. Culley and Mr. Lyron Graves, the human reasources business partner, that the accommodations were not implemented and fragrance harassment further escalated. But Ms. Culley and Mr. Graves didn't take any action to ensure that the policies were implemented.

78.     A fair investigation and resolution of the disability harassment never occurred.

79.      Instead, the University repeatedly insisted it would investigate the peripheral matter of the appropriateness of the granted accommodations, but without gathering the appropriate personnel/resources to do so.

**G. Dr. Faubel Requests a Formal Investigation**

80.     Dr. Faubel alerted the University of Pittsburgh to the failure to implement her accommodations in December 2022.

81.     Dr. Faubel gave the University of Pittsburgh time to implement the accommodations. She also worked hard to communicate and work on the accommodations. However, by the Summer of 2022, it was obvious that the University of Pittsburgh and Dr. Lo had no intention of implementing the promised accommodations.

82.     Dr. Faubel made several complaints to Dr. Lo regarding the failure to implement the accommodations and her colleagues' insistence on wearing or bringing items that contained Triggering Chemicals to the workplace. However, her complaints were not addressed. Dr. Lo threatened in a lab meeting to return Dr. Faubel's funding if she couldn't work in the presence of excessive fragrance.

83.      On or about June 2022, Dr. Faubel filed a formal complaint of harassment with the externalized complaint system regarding the failure of the University of Pittsburgh to implement the accommodations or otherwise stop the hostile work environment. Dr. Faubel requested that the University of Pittsburgh conduct an investigation.

84.     Dr. Faubel was referred to different persons in the ODEI including policy maker Laurel Gift, and eventually asked to submit another complaint.

85.   Dr. Faubel provided documentation of the harassment she experienced between 2019 and 2022.

86.   The disability harassment caused Dr. Faubel to lose critical experiments and other research due to the inaccessibility of the lab area, time off work to recover, and inability to use critical equipment.

87.   The harassment continued into the Summer of 2022 when Ms. Sahagun returned to the University of Pittsburgh after she had allegedly left employment. Ms. Shagun used fragranced hand-sanitizing lotion to injure Dr. Faubel as she had in the past. Ms. Sahagun left the bottle demonstratively next to Dr. Faubel's workspace.

88.   In August 2022, Dr. Faubel received confirmation from the University that the grievance would be investigated by Denton's Cohen & Grigsby.

89.    On or about July 27, 2022, someone used Dr. Faubel's University of Pittsburgh email address to sign up for Bath and Body Works advertisements resulting in great distress to Dr. Faubel. Dr. Faubel's reactive asthma had become so severe that Bath and Body Works items could cause her serious and significant injuries.

90.   Dr. Faubel requested that Dr. Lo install a camera near her office so that she could see if someone was intentionally leaving Triggering Chemicals in her office but Dr. Lo refused to do so.

91.   On or about August 17, Dr. Faubel's office was flooded with limonella scent and she collapsed onto the floor. She recovered after a few hours but her airway was sensitized. The next day, a very strong potpourri scent was placed on the shelf in the shared office space that Dr. Faubel had to cross to get to her office. Dr. Faubel suffered from pain and reactive asthma and had to be treated in the Emergency Room.

92.     On or about August 19, 2022, Dr. Faubel was supposed to use the microscope room but was unable to do so because of the prior day's exposure. Her VOC monitor confirmed high levels of VOCs that evaporated over time and the spill was again refreshed.

93.     On or about August 23, 2022, the entry area and lunch area were flooded with Bath and Body Works lotions.

94.     On or about August 25, 2022, there was Bath and Body Works lotion in the area where Dr. Faubel worked on bay 5. Dr. Faubel again had to seek medical treatment due to the exposure.

95.     On or about August 27, 2022, the lab was flooded with fragrance that made it impossible for Dr. Faubel to even enter. Dr. Faubel called her student worker so they could go into a different part of the building to perform some other work, but when they returned hours later, fragrance was still present even though reduced. Dr. Faubel was able to enter the lab and try to sniff out where the source was. She located spilled lotion on a shelf in front of her workplace. Dr. Faubel quickly left the workplace to avoid any more exposure and asked Dr. Lo to retrieve the access information to the lab from building's police so they would know who might be responsible for the attempted assault. It was a weekend day, and only Dr. Faubel and her student were present in the lab at this time.

96.     On or about August 27, 2022, Dr. Faubel informed Dr. Lo of the ongoing exposures and Dr. Lo stated that she would ask Mr. Kaszynski about the matter but then refused to answer.

97.     On September 13, 2022, a freezer with all of Dr. Faubel's samples was misplaced and she was unable to perform any work.

98.     On or about September 15, 2022, a refrigerator was left open overnight resulting in Dr. Faubel's experiments being damaged from heat.

99.     On or about September 19, 2022, someone left an orange out in the office at another person's desk. Dr. Faubel's colleague emailed the owner of the desk and reminded her of Dr. Faubel's disability. The person with the orange denied bringing it into the office.

100.    On or about October 28, 2022, Dr. Faubel entered her workplace and found it blocked. Dr. Faubel again reported the issues with Accessibility to Dr. Lo.

101.    Dr. Faubel experienced many additional spills throughout 2019 and until her employment termination in December 2022.

**H. Dr. Faubel complies with the University of Pittsburgh's Investigation**

102.    On or about September 13, 2022, Dr. Faubel met with the outside investigator about the harassment and failure to implement the accommodations for the complaint she filed in June 2022.

103.     The investigation was limited to a failure to accommodate and did not include the harassment.

104.    Dr. Faubel and the investigator ended the meeting with Dr. Faubel agreeing to provide written answers to the investigator's questions.

105.    On or about October 11, 2022, Dr. Faubel provided forty-five pages of answers containing specific instances of harassment and failure to implement any accommodations to the University of Pittsburgh's outside investigator.

106.    On or about October 11, 2022, in response to being specifically asked what additional accommodations could help implement the original accommodations by the independent investigator, Dr. Faubel provided the following requests for accommodations:

        a.   Training on her accommodations for the whole department;

b.  Emails to Dr. Faubel to clarify which products contained Triggering Chemicals;

c.  Designated Safety person for Dr. Faubel to contact if she lost consciousness again or experienced life-threatening anaphylaxis, as Dr. Faubel was specifically told not to contact campus security anymore;

d.  CCTV Camera to see if anyone went into her office or work area;

e.  Written reprimands for violations of the anti-discrimination policy and anti-retaliation policy if someone purposefully or deliberately wore or brought in items that contained known Triggering Chemicals, as in if a colleague purposefully wore Bath and Body Works after being asked not to do so;

f.  New hires would be informed of Dr. Faubel's accommodations;

g.  Signs placed and *replaced when ripped down* alerting others to Dr. Faubel's accommodations;

h.  Fully implementing fragrance-free cleaning solutions.

107.   The University of Pittsburgh did not implement any of Dr. Faubel's above-requested accommodations.

108.   Dr. Faubel provided numerous documents to support her complaints.

**I. Dr. Faubel is forced to take FMLA.**

109.   By October 28, 2022, Dr. Faubel did not know what to do. The University of Pittsburgh allegedly granted her accommodations almost a year before but had not implemented them and she continued to experience both unintentional and very intentional exposures.

110.    Dr. Faubel requested to take FMLA leave until the University of Pittsburgh could implement the accommodations they had already approved for her.  She was unable to take FMLA leave.

111.    In or around November 2022, Dr. Faubel filed a Charge of Discrimination with the EEOC.

**J. University of Pittsburgh Terminates Dr. Faubel's Contract**

112.    Finally, Dr. Faubel's contract was not renewed in violation of the University of Pittsburgh's policies.

113.    As a non-tenure stream faculty member, she should have been notified about reappointment should funding be available.

114.     However, her contract made no mention of additional grant funding but was a final termination of her faculty position "[Y]our full-time faculty appointment will not be renewed beyond December 31, 2022." Together with the new job description, this was a demotion for Dr. Faubel. "together with the new job description, this was a demotion for Dr. Faubel". Dr. Faubel was denied access to the lab and the benefits of University policies including the faculty handbook, which she depended on to secure continued funding.

115.    Dr. Faubel's previous five contracts did not contain non-renewal language.

116.    Further, the temporal proximity of the contract with the non-renewal language to Dr. Faubel's request for an investigation of disability discrimination is indicative of retaliation.

117.    From the beginning, Dr. Faubel was transparent, setting her needs into context, and thoughtfully researching and preparing information to facilitate efficient implementation and enforcement of accommodations.

118.     The University of Pittsburgh, however, excluded her from discussions, kept decisions about accommodations secret and didn't even provide access to the mandatory reports of her workplace injuries to OSHA, or Dean Losee's harassment investigation to NIH, or the final investigation conducted by the independent investigator.

119.      Dr. Faubel faced discrimination at every point of the process and was retaliated against for reporting, witnessing, providing evidence, and sharing her insight and expertise.

120.     Dr. Faubel faced significant retaliation for bringing forth complaints of discrimination.

121.     Upon information and belief, Dr. Faubel was replaced by a non-disabled individual.

122.     The Defendant's extreme and outrageous conduct warrants the imposition of substantial compensatory damages and punitive damages.

## V. CLAIMS FOR RELIEF

### COUNT I - Violation of Americans with Disabilities Act Failure to Accommodate

123.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

124.     Defendant failed to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112.

125.     As set forth above, Plaintiff is an individual with a disability because she suffers from an impairment that substantially limits one or more major life activities.

126.     Plaintiff informed Defendant of that disability and requested a reasonable accommodation on several occasions.

127.     Defendant failed to engage in the interactive process and failed to accommodate Plaintiff's disability, despite the availability of reasonable accommodations for Plaintiff's disability.

128.    Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT II - Violation of Americans with Disabilities Act Hostile Work Environment

129.    Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

130.    As set forth above, Plaintiff is an individual with a disability because she suffers from an impairment that substantially limits one or more major life activities.

131.    After Plaintiff informed Defendant of her disability, Defendant engaged in unwelcome conduct because of Plaintiff's disability that altered the terms and conditions of her employment.

132.    Defendant's conduct was severe or pervasive, was offensive to Plaintiff, and would have been offensive to a reasonable person.

133.    By failing to prevent and/or correct the severe or pervasive hostile work environment toward Plaintiff Defendant created a hostile work environment because of Plaintiff's disability in violation of the Americans with Disabilities Act.

134.    Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT III - Violation of Americans with Disabilities Act Retaliation

135.    Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

136.    Defendant intentionally retaliated against Plaintiff because of her continued reasonable accommodation requests and good faith complaint of disability discrimination, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12203.

137.    Defendant allowed employees to harass Plaintiff in retaliation for engaging in protected activity.

138.    Plaintiff's contract was not renewed and her employment was terminated in retaliation for engaging in protected activities including filing an EEOC charge.

139.    Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT IV - Violation of Section 504 of the Rehab Act Failure to Accommodate

140.    Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

141.    Defendant failed to accommodate Plaintiff's disability in violation of Section 504 of the Rehabilitation Act of 1973.

142.    As set forth above, Plaintiff is an individual with a disability because she suffers from an impairment that substantially limits one or more major life activities.

143.    Plaintiff informed Defendant of that disability and requested a reasonable accommodation on several occasions.

144.    Defendant failed to engage in the interactive process and failed to accommodate Plaintiff's disability, despite the availability of reasonable accommodations for Plaintiff's disability.

145.    Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

**COUNT V - Violation of Section 504 of the Rehab Act - Retaliation**

146.   Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

147.   Defendant intentionally retaliated against Plaintiff because of his continued reasonable accommodation requests and good faith complaint of disability discrimination, in violation of Section 504 of the Rehabilitation Act of 1973.

148.   Defendant intentionally retaliated against Plaintiff because of her continued reasonable accommodation requests and good faith complaint of disability discrimination, in violation of Section 504 of the Rehabilitation Act of 1973.

149.   Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

**COUNT VI- Violation of the PHRA**

150.   Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

151.   Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq.

152.   Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a) Assume jurisdiction herein;

(b) Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c) Award Plaintiff wage loss damages, including back pay and front pay, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment;

(d) Award Plaintiff compensatory damages under ADA and PHRA;

(e) Award Plaintiff punitive damages under ADA and Section 504;

(f) Award Plaintiff pre and post-judgment interest;

(g) Award Plaintiff costs and attorneys' fees; and

(h) Grant such other relief as the Court deems just and appropriate.


Respectfully Submitted,


*/s/ Rachel L, McElroy* ___
Rachel L. McElroy, Esq.
PA ID No. 321624

McElroy Law Firm, LLC
960 Penn Ave., #1001
Pittsburgh, PA 15222
Phone: 412-620-8735
rachel@mcelroylawfirm.com

Attorney for Plaintiff